# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

RUPERT J. ORTEGA,

    Plaintiff,

vs.                                                     Civ. No. 18-1092 KK

ANDREW SAUL, Commissioner
of the Social Security Administration,

    Defendant.

## MEMORANDUM OPINION AND ORDER[1]

THIS MATTER is before the Court on Plaintiff Rupert J. Ortega's ("Mr. Ortega") Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 16) ("Motion"), filed March 19, 2019, seeking review of the unfavorable decision of Defendant Andrew Saul, Commissioner of the Social Security Administration ("Commissioner"), on Mr. Ortega's claim for Title II disability insurance benefits under 42 U.S.C. §§ 405(g) and 1383(c)(3). The Commissioner filed a response in opposition to the Motion on May 29, 2019, (Doc. 19), and Mr. Ortega filed a reply in support of the Motion on June 18, 2019. (Doc. 20.) Having meticulously reviewed the entire record and the applicable law and being otherwise fully advised in the premises, the Court FINDS that Mr. Ortega's Motion is well taken and should be GRANTED.

### I.     Background

**A.     Procedural History**

On March 24, 2014, Mr. Ortega filed an application with the Social Security Administration ("SSA") for Disability Insurance Benefits ("DIB") under Title II of the Social

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 9.)

Security Act. (Administrative Record ("AR") 067.) He alleged a disability onset date of March 25, 2012 and that he was suffering from, *inter alia*, arthritis and carpal tunnel syndrome. (AR 068-69.) Disability Determination Services ("DDS") determined that Mr. Ortega was not disabled both initially (AR 096) and on reconsideration. (AR 102.) Mr. Ortega requested a hearing with an Administrative Law Judge ("ALJ") on the merits of his application. (AR 107.)

ALJ Lillian Richter held a hearing on June 13, 2017. (AR 035-66.) Mr. Ortega and Vocational Expert (VE) Sandra Trost testified. (Id.) ALJ Richter issued an unfavorable decision on December 8, 2017. (AR 010-29.) The Appeals Council denied Mr. Ortega's request for review on September 24, 2018 (AR 001-4), making the ALJ's decision the final decision of the Commissioner from which Mr. Ortega appeals. *See Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).

**B.      Mr. Ortega's Background, Medical Treatment, and Hearing Testimony**

Mr. Ortega is a high school graduate who worked as an auto mechanic for thirty years. (AR 039-41.) In September 2011, he began seeing Dr. Matthew Patton at New Mexico Orthopaedics for treatment of a right-long-finger injury he sustained in a March 2011 motorcycle accident. (AR 271-72.) Dr. Patton diagnosed Mr. Ortega with right long finger metacarpophalangeal ("MCP") joint arthritis with traumatic exacerbation and treated him with an injection of Kenalog and Marcaine. (AR 271-72.) At that time, Dr. Patton noted "fairly advanced joint space narrowing at the third MCP joint." (AR 271-72.) When Mr. Ortega established with Dr. Don Ortiz at Midtown Family Medical in April 2012, he reported experiencing "chronic [right] wrist pain" but received no treatment for that condition at that time. (AR 325.) When Mr. Ortega complained of intermittent pain and mild swelling in his right wrist at a visit in December 2013, Dr. Ortiz ordered x-rays,

suspecting osteoarthritis. (AR. 327.) The December 2013 x-rays found "[m]inimal degenerative changes in the triscaphe joint" but no other remarkable findings. (AR 320.)

Mr. Ortega returned to Dr. Patton in February 2014 following an injury he sustained to his left small finger in January 2014 while unloading car parts. (AR 249, 328.) He complained of "bilateral dorsal wrist pain[] and weakness" as well as right long finger MCP joint pain and left small finger joint swelling. (AR 249.) Dr. Patton diagnosed Mr. Ortega with bilateral possible carpal tunnel syndrome, bilateral wrist pain (wrist joint), and bilateral wrist ulnar impaction syndrome (right worse than left). (AR 250.) He noted that Mr. Ortega described his pain as being "worse with activities[,]" specifically bearing weight, grasping, walking, movement of area, exercise, opening lids, and[]lifting[,]" and gave Mr. Ortega wrist splints to be used at night. (AR 249-51.) He also ordered a nerve conduction study and electromyography test to confirm possible carpal tunnel syndrome. (AR 250-51.)

Following testing, Mr. Ortega was diagnosed with bilateral carpal tunnel syndrome in March 2014. (AR 245, 248.) At the time of diagnosis, Dr. Patton noted that Mr. Ortega's symptoms "are not severe" and that he "is able to do light and moderate activity without too much difficulty." However, he also noted that Mr. Ortega reported experiencing "more pain and numbness and tingling" with "heavy twisting type activities" and that Mr. Ortega's symptoms made it "very difficult" to do his previous work as a mechanic. (AR 245.) He prescribed the use of elbow pads to address Mr. Ortega's complaint of positional ulnar nerve irritation while sleeping, noted that surgery was an option if Mr. Ortega's symptoms worsened, and advised Mr. Ortega to return for treatment as needed. (AR 245.)

Mr. Ortega again sought treatment from Dr. Ortiz for his hand and wrist pain in April 2016. (AR 330.) Dr. Ortiz prescribed Mr. Ortega etodolac for pain management and referred him to

Academy Orthopedics to follow up on his complaint of chronic right wrist pain.[2] (AR 330.) In November 2016, Mr. Ortega was seen at New Mexico Cancer Center for a rheumatology consultation on referral of Dr. Ortiz. (AR 335.) Following lab testing and x-rays, Dr. James Steier diagnosed Mr. Ortega with primary osteoarthritis of the right hand and right wrist. (AR 335-38.) He noted "synovial thickening on the bilateral wrists, right greater than left, with some loss of range of motion on extension and flexion" and treated Mr. Ortega with a local cortisone shot to the right wrist and right third MCP joint "for symptomatic relief of pain." (AR 340.) In January 2017, Mr. Ortega was seen at Jaynes Companies Healthcare Clinic and prescribed meloxicam to treat what was diagnosed as "other chronic pain" and "pain in unspecified joint." (AR 358-59.) At a follow-up visit in April 2017, his meloxicam prescription was refilled. (AR 355-56.)

On April 10, 2017, Mr. Ortega was evaluated at Spine Solutions for occupational therapy services to address his "[l]imited functional use of [both] hands for [activities of daily living]/household tasks" due to pain in both hands and in his right wrist.[3] (AR 381-83.) The evaluator documented Mr. Ortega's pain as being "progressive" and noted that Mr. Ortega reported that he "[f]eels [w]orse" when doing things like wringing out a rag, using hand tools, lifting a gallon of milk, lifting a vacuum cleaner, and holding anything that vibrates. (AR 381.) While certain of his ranges of motion in his wrists were assessed as being below normal or at the low end of normal, the evaluator indicated that his active range of motion in his hands was "W[ithin] F[unctional] L[imits]." (AR 382.) At his initial visit, Mr. Ortega received laser treatment and instructions for a home exercise program, the goal of which was to increase his ability to

---

[2] The record contains no medical records from Academy Orthopedics.
[3] The Court notes that Mr. Ortega's physical therapy was also designed to address functional limitations caused by his right knee pain. (AR 381.) However, the Court's discussion focuses on the evidence as it relates to Mr. Ortega's wrist-/hand-related impairment only because that is the error of which Mr. Ortega complains and that the Court concludes disposes of this appeal.

independently perform household tasks and lifting. (AR 381-82.) Mr. Ortega continued to be seen weekly at Spine Solutions until May 24, 2017 when he was discharged upon successful completion of his therapeutic program. (AR 384-399.) At each of his other five therapy sessions, Mr. Ortega received self-care advice, i.e., instructions for his home exercise program, manual therapy, and cold laser treatment to his wrists for management of his symptoms. (AR 384, 386, 388, 390, 392.) While he reported some improvement in his symptoms overall, he also reported experiencing an "ongoing problem" with swelling in his hands "after extended time working with them on [a] car or in [the] yard." (AR 386, 390, 392.) To address the problem of swelling, Mr. Ortega was advised how to modify his activities in order to reduce his symptoms. (AR 386.) At his pre-discharge reevaluation, Mr. Ortega reported that he continued to experience intermittent and occasional symptoms and felt that there had been "minimal change . . . with therapy." (AR 392.) His ranges of motion were recorded as being "mostly the same" as prior to occupational therapy with only his range of motion in his thumbs having improved. (AR 392.)

At his hearing before ALJ Richter in June 2017, Mr. Ortega testified that he has difficulty opening jar lids, twisting a washrag, picking up the vacuum cleaner, putting his hands in his pockets, combing his hair, and brushing his teeth. (AR 043.) He explained that he wears wrist splints to limit the range of motion in his wrists because "the pain kicks in" as his range of motion increases. (AR 042.) And while he continued to practice the exercises and stretches that he learned at Spine Solutions, he reported being able to lift only a small amount—around one pound—with his right hand without triggering pain. (AR 042-43.) He additionally testified that while he does do some yard work, he does "[a]s little as possible" and only things such as "pick up a stick here and there[,]" turn on the water pump, and "move the garden hose here and there[.]" (AR 059.) And though he owns a motorcycle, he explained that he rides it infrequently and when he does, he

5

travels only short distances and drives with his hand crossed over in order to operate the throttle. (AR 058.)

**C.    Opinion Evidence**

In January 2015, non-examining State agency physician Dr. Ronald Davis found at the initial level that Mr. Ortega suffered from two severe, medically determinable impairments: (1) dysfunction of major joints, and (2) fracture(s) of the upper extremities. (AR 072.) He opined that Mr. Ortega was able to perform light work without any manipulative limitations and with only minimal postural limitations, to wit, occasional stooping and crouching but no other postural limitations. (AR 073-75.) At the reconsideration level in July 2015, Mr. Ortega was determined to additionally suffer from the severe, medically determinable impairment of carpal tunnel syndrome. (AR 085.) Like Dr. Davis, non-examining State agency physician Dr. M. Bijpuria found that Mr. Ortega is limited to light work; however, unlike Dr. Davis, who found that Mr. Ortega has no manipulative limitations, Dr. Bijpuria found that Mr. Ortega's gross manipulation (i.e., ability to handle) was "limited to occasionally" in his right upper extremity due to his carpal tunnel syndrome and arthropathy. (AR 089.) He also assessed a greater number of postural limitations than Dr. Davis. While he agreed with Dr. Davis that Mr. Ortega was limited to occasional stooping and crouching, he opined that Mr. Ortega was also limited to occasional balancing, kneeling, and crawling, and could frequently climb ramps and stairs.[4] (AR 088-89.)

**D.    The VE's Testimony and the ALJ's Decision**

At the administrative hearing, the ALJ presented VE Trost with a hypothetical residual functional capacity ("RFC") assessment that limited Mr. Ortega to light work with certain postural,

---

[4] Dr. Bijpuria's July 2015 assessment is the most recent assessment of record containing opinions regarding Mr. Ortega's physical functional limitations. The record contains no medical source statement from either a treating provider or an evaluating physician that bear upon Mr. Ortega's physical functional limitations.

6

manipulative, and mental limitations. (AR 064.) In relevant part, the ALJ's hypothetical RFC included a manipulative limitation providing that Mr. Ortega "can frequently handle, finger and feel bilaterally." (AR 064.) VE Trost testified that given the ALJ's hypothetical RFC, Mr. Ortega could not perform his past relevant work but that there exist other jobs in the national economy that he could perform, including marker, photocopy machine operator, and office helper. (AR 064-65.) When presented with the ALJ's alternative hypothetical RFC limiting Mr. Ortega to occasional, rather than frequent, handling and feeling with his right upper extremity, VE Trost testified that the identified jobs would be eliminated and that no other work existed that Mr. Ortega could perform. (AR 065.)

In her decision, the ALJ found that Mr. Ortega's "severe impairments" include mononeuritis carpal tunnel syndrome and mild osteoarthritis of the right hand and wrist but that the record did not support finding any of Mr. Ortega's "severe impairments" presumptively disabling.[5] (AR 015-18.) She, therefore, proceeded to assess Mr. Ortega's RFC to determine whether he could either return to his past relevant work or make an adjustment to other work. (AR 016-27.) *See* 20 C.F.R. § 404.1520(a)(4) (setting forth the five-step sequential evaluation process the SSA follows in evaluating DIB claims); *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). The ALJ assessed Mr. Ortega as having the RFC to perform "a limited range of light work . . . except that he can frequently climb ramps and stairs, never climb ladders, ropes, or scaffolds, and never crawl." (AR 018.) She further found that he "can occasionally balance, stoop, kneel, and crouch" and that he can "frequently handle, finger, and feel bilaterally."[6] (AR 018.) Although she found him unable to perform his past relevant work, the ALJ determined at step five of the

---

[5] The ALJ additionally found as severe impairments right plantar fasciitis, post right knee meniscus repair, bilateral heel spurs, unspecified bipolar disorder, and attention deficit hyperactivity disorder.
[6] The ALJ additionally found Mr. Ortega to have certain mental function limitations that the Court does not consider relevant to the disposition of this matter and therefore does not address.

sequential evaluation process, and based on the testimony of VE Trost, that Mr. Ortega was not disabled based on her conclusion that given his education, work experience, and RFC, he is capable of making a successful adjustment to other work. (AR 027-29.)

## II. Discussion

Mr. Ortega argues, *inter alia*, that the ALJ erred by "fail[ing] to incorporate" Dr. Bijpuria's opinion that Mr. Ortega is limited to only *occasional* handling. (Doc. 16 at 12.) Specifically, Mr. Ortega challenges the validity and adequacy of the ALJ's proffered reasons for discounting Dr. Bijpuria's opinions. (Doc. 16 at 13-14.) The Commissioner contends that the ALJ "reasonably found that the evidence of record"—specifically, Mr. Ortega's reported activities of exercising, operating a motorcycle, doing yardwork, and working on a car—"did not support finding a limitation to occasional gross manipulation" and that the ALJ's RFC assessment is supported by substantial evidence (Doc. 19 at 1-011.) The Court agrees with Mr. Ortega that the ALJ's reasons for discounting Dr. Bijpuria's opinion are not supported by substantial evidence and are legally inadequate.

**A.    Applicable Law**

**1.    Standard of Review**

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (alteration and quotation marks omitted). In making these determinations, the Court must meticulously examine

8

the entire record but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues de novo. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (internal quotation marks omitted). Substantial evidence is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118 (internal quotation marks omitted), or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

2.  **Weighing Opinion Evidence**

"[W]hen assessing a plaintiff's RFC, an ALJ must explain what weight is assigned to each opinion and why." *Silva v. Colvin*, 203 F. Supp. 3d 1153, 1157 (D.N.M. 2016); *see* SSR 96-6P, 1996 WL 374180, at *4 (July 2, 1996) (providing that an ALJ "must consider and evaluate any assessment of the individual's RFC by a State agency medical or psychological consultant and by other program physicians or psychologists"). "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8P, 1996 WL 374184, at *7 (July 2, 1996). "State agency medical . . . consultants are highly qualified physicians . . . who are experts in the evaluation of the medical issues in disability claims

under the Act." SSR 96-6P, 1996 WL 374180, at *2. While ALJs are not bound by findings made by state agency consulting physicians, "they may not ignore these opinions and must explain the weight given to the opinions in their decisions." *Id.* Medical opinions must be weighed using the factors set forth in 20 C.F.R. § 404.1527(c), comprising (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors.[7] To be sure, "[n]ot every factor for weighing opinion evidence will apply in every case," SSR 06-03P, 2006 WL 2329939, at *5 (Aug. 9, 2006), and the ALJ is not required to "apply expressly each of the six relevant factors in deciding what weight to give a medical opinion." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Rather, what is required is that the ALJ provide good reasons for the weight she gives an opinion and that her explanation is sufficiently specific to make it clear to any subsequent reviewers the weight given to an opinion and the reasons for that weight. *See id*.

**B.     The ALJ's Weighing of the Medical Opinions of Record**

The ALJ summarized the opinion evidence of record regarding Mr. Ortega's physical limitations as follows:

> As for the opinion evidence, Ronald Davis, M.D., a State agency medical consultant, opined on January 13, 2015, that [Mr. Ortega] is able to perform light work with occasional stooping and crouching . . . . I accord some weight here. Additional evidence received at the reconsideration and hearing levels support finding the greater restrictions set forth above . . . .
>
> M. Bijpuria, M.D., a State agency medical consultant at the reconsideration level, opined on July 8, 2015, that [Mr. Ortega] is able to perform light work with occasional gross manipulation with the right upper extremity . . . . Dr. Bijpuria further opined that [Mr. Ortega] could frequently climb ramps and stairs, and occasionally balance, stoop, kneel, crouch, crawl, and climb ladders, ropes, or

---

[7] The agency has issued new regulations regarding the evaluation of medical source opinions for claims filed on or after March 27, 2017. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); 20 C.F.R. 404.1527 and 404.1520c. Because Plaintiff filed his claims in 2014, the previous regulations still apply to this matter. *Id.*

scaffolds. I give some weight here. The evidence of record does not support finding occasional gross manipulation with the right upper extremity . . . . By April 2017, [Mr. Ortega] reported little or no symptoms in his hands and wrists, and he was working on a car and performing yard work at that time. Additionally, he was operating a motorcycle and exercising at times after the alleged onset of disability . . . . Such activities do not support that manipulative limitation.

(AR 024 (citations omitted).)

The ALJ agreed with Drs. Davis and Bijpuria that Mr. Ortega has the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) (i.e., the ability to occasionally lift and carry up to twenty pounds, frequently lift and carry up to ten pounds, and at least frequently stand, walk, sit, push, and pull). (AR 015, 073-74, 088.) She also agreed with Drs. Davis and Bijpuria that Mr. Ortega is limited to occasional stooping and crouching and that he is unlimited in his ability to reach in any direction. (AR 015, 0.) However, regarding Dr. Davis, she rejected every one of his other opinions, i.e., that Mr. Ortega had no limitations in (1) climbing ramps and stairs, (2) climbing ladders, ropes, and scaffolds, (3) balancing, (4) kneeling, (5) crawling, (6) handling, (7) fingering, and (8) feeling. In each of these areas of functioning, the ALJ assessed a *greater* limitation than that assessed by Dr. Davis based on unspecified "[a]dditional evidence" received at the reconsideration and hearing levels. (AR 024.) In most cases, the ALJ assessed a limitation of either "frequently" or "occasionally" where Dr. Davis found Mr. Ortega had unlimited functioning, and in two areas of functioning—climbing ladders, ropes, and scaffolds, and crawling—the ALJ found that Mr. Ortega can "never" perform those functions where Dr. Davis found no limitation at all.

Regarding Dr. Bijpuria, the ALJ agreed with five of seven of his opinions regarding Mr. Ortega's postural limitations and assessed *greater* limitations in the other two areas: climbing ladders, ropes, and scaffolds, and crawling. (AR 018, 088-89.) With respect to Dr. Bijpuria's opinions regarding Mr. Ortega's manipulative limitations, the ALJ agreed with Dr. Bijpuria's opinion that Mr. Ortega was unlimited in his ability to reach, and she assessed *greater* restrictions

11

than Dr. Bijpuria in two of areas of manipulative functioning: (1) fingering (fine manipulation), and (2) feeling. (AR 018, 089.) Where Dr. Bijpuria opined that Mr. Ortega was unlimited in those areas, the ALJ found Mr. Ortega to be limited to frequent fingering and feeling. (AR 018, 089.) Of the combined eleven postural and manipulative functions assessed, the only area of functioning in which the ALJ assessed a *less* restrictive limitation than that contained in a medical opinion of record was handling.[8] Unquestionably, the ALJ was free to disagree with any and all of the medical opinions of record, including Dr. Bijpuria's handling opinion. The question is whether her decision demonstrates that she applied the correct legal standards for considering that opinion and whether substantial evidence supports her finding that Dr. Bijpuria's opinion is unsupported by the evidence. It is to that question that the Court now turns.

C. **The ALJ's reasons for discounting Dr. Bijpuria's handling opinion are legally inadequate and not supported by substantial evidence.**

In her narrative discussion supporting her RFC assessment, the ALJ recognized that Mr. Ortega sought treatment for right hand problems in September 2011, December 2013, March 2014, April 2016, November 2016, and April 2017. (AR 019-21.) She noted that x-rays taken in September 2011 showed "fairly advanced joint space narrowing at the third MCP joint" of Mr. Ortega's right hand and that those taken in December 2013 and November 2016 showed "mild degenerative changes" in his right hand and wrist. (AR 019, 021.) She noted that an MRI taken in March 2014 "demonstrated [a] probable case of ulnar abutment syndrome" of Mr. Ortega's right wrist and that a nerve conduction study conducted that same month "was positive for mild carpal tunnel syndrome, bilateral[.]" (AR 019.) While she recognized that Mr. Ortega "was diagnosed

---

[8] Mr. Ortega complains that this aspect of the ALJ's decision constitutes impermissible picking and choosing. (Doc. 16 at 12; Doc. 20 at 1.) *See Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) ("An ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability."). Mr. Ortega's reliance on *Haga* is misplaced as Dr. Bijpuria's handling opinion was not uncontradicted; Dr. Davis opined that Mr. Ortega had no handling limitation.

12

with mononeuritis carpal tunnel syndrome[,]" she did *not* recognize that Dr. Patton, who made the carpal tunnel syndrome diagnosis in March 2014, also diagnosed Mr. Ortega at that time with right wrist ulnar impaction syndrome and bilateral cubital tunnel syndrome. (*Compare* AR 019, *with* AR 245.) She noted that Dr. Patton's treatment note described Mr. Ortega's symptoms as "not severe, as he was able to perform light and moderate activity without too much difficulty" but specified that "[t]here was increased pain, numbness, and tingling with heavy twisting type activities." (AR 019-20, 245.) She noted that in November 2016, Dr. Steier observed "bony enlargement in the joints of the hands, some synovial thickening on the bilateral wrists, right greater than left, with some loss of range of motion on extension and flexion" and impliedly, though not expressly, acknowledged that Dr. Steier diagnosed Mr. Ortega with osteoarthritis of the right hand and wrist. (AR 015, 021.) She noted that Mr. Ortega sought follow-up care for his "joint pain" in April 2017 and that his exam at that time "was notable for decreased range of motion to the bilateral hands and wrists, and his right knee." (AR 021.) She noted that Mr. Ortega began physical therapy in April 2017 "for his hand and knee pain" but did not discuss the evidence contained in the treatment records from his seven visits other than to note that he was able to "lift and carry up to 25 pounds, and push or pull up to 20 pounds" during the physical ability test he took at his discharge appointment. (AR 021, 399.) She acknowledged that Mr. Ortega had received injections in his right hand on two occasions, takes prescription pain medication, uses wrist splints, complained of "constant throbbing and pain in his . . . wrists, hands and fingers," experienced "chronic swelling[,]" and "alleged limitations with opening a jar, twisting rags, brushing his teeth, and other activities." (AR 018-19, 021.)

Despite the foregoing evidence, the ALJ discounted Dr. Bijpuria's handling opinion because she found that "[t]he evidence of record does not support finding occasional gross

13

manipulation with the right upper extremity." (AR 024.) She cited five pieces of evidence she found to be inconsistent with a limitation to occasional handling: that Mr. Ortega (1) reported "little or no symptoms in his hands and wrists" as of April 2017, (2) was "working on a car" in April 2017, (3) was "performing yard work" in April 2017, (4) was "operating a motorcycle" at times after the alleged onset of disability, and (5) was "exercising" at times after the alleged onset of disability. (AR 024.) Mr. Ortega argues that "a closer review" of the evidence the ALJ cited in fact supports rather than contradicts Dr. Bijpuria's handling opinion. (Doc. 16 at 13.) The Court agrees and for the following reasons concludes that the ALJ erred in finding that Dr. Bijpuria's opinion was not supported by the evidence of record.

Regarding the ALJ's first proffered reason for discounting Dr. Bijpuria's opinion, the record does not support the ALJ's finding that "[b]y April 2017, [Mr. Ortega] reported little or no symptoms in his hands and wrists[.]" (AR 018.) In fact, in April and May 2017, Mr. Ortega was attending weekly occupational therapy sessions to address chronic wrist pain that limited his ability to perform daily household tasks. (AR 381-99.) On April 24, 2017, he specifically reported an "ongoing problem" with swelling in his hands after doing yard work and was given advice by his physical therapist "for grading activity for reduced s[ymptoms]." (AR 386.) He was receiving weekly cold laser treatments and manual therapy "for s[ymptom] m[ana]g[e]m[en]t" and had been taking meloxicam on a daily basis since January of that year to manage his wrist pain. (AR 359, 381, 384, 386, 388, 390.) While true that Mr. Ortega reported experiencing "no s[ymptoms]" at one of his therapy sessions, he consistently reported that his symptoms would "come and go" and only that he had no symptoms "today." (AR 388, 390, 392.) Indeed, at his re-evaluation just prior to discharge, he reported that his symptoms "are intermittent and occasional" and that there was "minimal change in this with therapy." (AR 392.) The ALJ addressed none of this evidence from

14

Spine Solutions' records and instead impermissibly included only a cherrypicked portion of one record that supported her position. *See Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) ("It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to h[er] position while ignoring other evidence.").

Moreover, Mr. Ortega testified at his administrative hearing in June 2017 that "what hurts a lot is opening jar lids, twisting a washrag, picking up the vacuum cleaner, putting my hands in my pocket[,] . . . combing my hair, brushing my teeth, so many things activate the miseries in the hands." (AR 043.) He stated that his pain level throughout the day averages around a seven on a ten-point scale but that it "varies" and, while sometimes lower, will "spike" to a ten on a daily basis depending on what he is doing. (AR 048-49.) He further testified that his hands "puff out" once a week to the point that he has to remove his ring. (AR 049.) The ALJ's decision fails to even mention Mr. Ortega's statements regarding these symptoms, let alone meaningfully explain how her rejection of Dr. Bijpuria's opinion is supported in light thereof. *See Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) (explaining that an ALJ must discuss not only the evidence supporting her decision but also "the uncontroverted evidence [s]he chooses not to rely upon, as well as significantly probative evidence [s]he rejects"). The ALJ's first reason for discounting Dr. Bijpuria's opinion is inadequate not only because it is not supported by substantial evidence but also because it evinces the ALJ's failure to comply with the applicable legal standards for evaluating the evidence in this case.

Regarding the ALJ's reliance on evidence of different activities Mr. Ortega purportedly engaged in that the ALJ found to be inconsistent with a handling limitation of occasional, while a claimant's activities "may be considered, along with other evidence, in determining whether a person is entitled to disability benefits[,]" evidence that a claimant "engages in limited activities"

15

does not necessarily establish that the claimant can engage in the work specified by the assessed RFC. *Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988). Moreover, it is not proper for an ALJ to "build [a] factual basis" for her findings by taking the claimant's testimony regarding his or her daily activities "out of context and selectively acknowledging parts of [the claimant's] statements while leaving important segments out." *Sisco*, 10 F.3d at 743. To the contrary, to determine the probative value of evidence regarding a claimant's activities, "it is necessary to look at the actual activities [the claimant] was talking about" because "the specific facts behind the generalities [may] paint a very different picture." *Krauser v. Astrue*, 638 F.3d 1324, 1332-33 (10th Cir. 2011).

Regarding the activity of "working on a car," the Court initially notes that it is not clear to what, exactly, the ALJ was referring. The only evidence cited by the ALJ is the April 24, 2017 treatment record from Spine Solutions wherein it is documented that Mr. Ortega reported that "typically his hands will swell after extended time working with them on car or in yard." (AR 024, 386.) But that record contains no indication that Mr. Ortega had recently been working on a car, only that he had recently done yard work. (AR 386.) The Court's review of the record indicates that the only specific evidence of Mr. Ortega "working on a car" at any point after he stopped working as a mechanic in 2012 is from medical records in January and February of 2014 indicating that he sought treatment for an injury to his left small finger that he sustained while "unloading car parts."[9] (AR 249, 328.) The record does not contain any evidence that Mr. Ortega worked on a car at any time after January 2014. Indeed, in his October 2014 Function Report, Mr. Ortega indicated that while "muscle car restoration" was a hobby and interest of his, he "had to stop almost all of [his hobbies]" or was only able to do them "in moderation" depending on whether his wrist, knees, and feet could handle it. (AR 200.) The ALJ's decision fails to explain—and the Court fails

---

[9] The ALJ referenced this evidence in a different part of her RFC narrative but not in her discussion of Dr. Bijpuria's opinion. (AR 024.)

to see—how in light of the foregoing evidence and in the absence of any additional probative evidence, a general statement by Mr. Ortega that his hands swell after "working with them on [a] car" renders Dr. Bijpuria's opinion unsupported.

The ALJ's reliance on evidence indicating that Mr. Ortega performed yard work and rode a motorcycle is similarly misplaced. Mr. Ortega testified that his performance of yard work involved doing "[a]s little as possible" and consisted of "pick[ing] up a stick here and there[,]" turning on the water pump, and "mov[ing] the garden hose here and there[.]" (AR 059.) He explained that he was watering the yard "quite often" at that time because his daughter was getting married that weekend and he was "trying to make the yard green." (AR 059.) Indeed, Mr. Ortega explained that while he would "try" to do the yard work, he received help from his wife, father, and even neighbors if he was unable to do it himself due to the pain in his hands. (AR 059.) Regarding motorcycle riding, Mr. Ortega testified that he rode his motorcycle at most three times a year, would only travel short distances, and had to drive with his hand crossed over in order to operate the throttle. (AR 058.) He also stated, "I was thinking of mounting it on the wall because it's just a showpiece." (AR 058.) The ALJ's discussion fails to even mention most of these specific facts. Instead, citing evidence that Mr. Ortega "testified that he drives his motorcycle approximately 3 times per year" and was in a motorcycle accident in October 2014, the ALJ concluded that "[a] reasonable inference is that, despite [Mr. Ortega's] testimony that he rides his motorcycle in a very specific manner, he was nonetheless capable of mounting and manipulating the motorcycle to an extent that allowed him to operate it." (AR 024.) It is notable that the ALJ failed to mention Mr. Ortega's specific testimony regarding the type of yardwork he does and how he operates his motorcycle and referred to those activities only in the most general of terms. In the context of assessing a handling limitation, Mr. Ortega's testimony regarding his *actual* activities

17

is significantly probative evidence that is consistent with and tends to support, rather than undercut, Dr. Bijpuria's opinion. The ALJ's failure to address that evidence not only undermines her basis for discounting Dr. Bijpuria's opinion but also demonstrates a failure to comply with the applicable legal standards for evaluating the evidence. *See Clifton*, 79 F.3d at 1010.

Finally, the fact that Mr. Ortega was "exercising at times after the alleged onset of disability" (AR 024) is, alone, neither here nor there in terms of providing a basis for the ALJ to reject Dr. Bijpuria's handling limitation. The only evidence the ALJ cited vis-à-vis her finding that Mr. Ortega engaged in exercise is a treatment record from October 2016 indicating that Mr. Ortega sought treatment for "muscle spasms" in his hamstrings at Midtown Family Medicine and in which it is noted that Mr. Ortega "has been exercising more [the] past few weeks." (AR 024, 333.) Neither the record cited nor any other evidence of record provides any insight into the nature of Mr. Ortega's exercise activities and, specifically, whether they could be said to implicate his ability to handle.[10] The ALJ neither explained the relevance of evidence that Mr. Ortega exercised nor logically connected that evidence to her determination that Dr. Bijpuria's handling opinion was unsupported by the record.

The ALJ's reasons for discounting Dr. Bijpuria's opinion are not supported by substantial evidence, and her decision fails to evince compliance with the applicable standard for weighing Dr. Bijpuria's opinion. While each of the reasons proffered is at least arguably facially valid, they prove to be invalid on the record before the Court and on the specific explanations—or rather lack thereof—supplied by the ALJ. The deficiencies in the ALJ's explanation of her reasons for

---

[10] The Commissioner additionally cites a medical treatment record from January 2017 in which it is noted that Mr. Ortega indicated "that he has a stationary bike and light weights which he plans to start using again." (AR 358; Doc. 19 at 10.) Not only did the ALJ not rely on that evidence, meaning it would be improper for this Court to do so, *see Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007) (explaining that reviewing courts "may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself"), but also evidence that Mr. Ortega owned and planned to start using "light weights" does not per se invalidate Dr. Bijpuria's opinion that he can handle occasionally.

discounting Dr. Bijpuria's do not constitute mere "technical omissions" that would not warrant reversal. *Cf. Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012) (explaining that where the reviewing court "can follow the adjudicator's reasoning in conduct [its] review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal"). As discussed above, the ALJ failed to address numerous pieces of evidence—both objective medical evidence and other evidence—probative of Mr. Ortega's claimed limitations in his ability to handle. That failure, coupled with the inadequacy of the reasons proffered by the ALJ for discounting Dr. Bijpuria's opinion, necessitates reversal and remand.[11]

**D.     The Court does not reach Mr. Ortega's other claims of error.**

Because remand is required based on the ALJ's failure to adequately support the weight she assigned to Dr. Bijpuria's handling opinion, the Court does not address the merits of Mr. Ortega's arguments that the ALJ (1) failed to incorporate all of the opinions consultative examiner Mary Loescher, Ph.D., and (2) failed to properly weigh the opinion of consultative psychological examiner Steven Baum, Ph.D. (Doc. 16 at 16-21.) *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) (explaining that the reviewing court need not reach issues raised that "may be affected by the ALJ's treatment of th[e] case on remand").

### III.     Conclusion

For the reasons stated above, Mr. Ortega's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 16) is GRANTED.

---

[11] Mr. Ortega contends that "substantial evidence demands a limitation to occasional handling and fingering" and asks the Court to remand for an immediate award of benefits. (Doc. 16 at 16, 21.) Because the Court disagrees that the record compels the conclusion that Mr. Ortega can handle and finger occasionally, and because the Court cannot say that remanding for additional factfinding would serve no useful purpose and would merely delay Mr. Ortega's receipt of benefits, the Court declines to exercise its discretion to remand for an immediate award of benefits. *See Salazar v. Barnhart*, 468 F.3d 615, 626 (10th Cir. 2006) (explaining that whether or not to award benefits is a matter of discretion and identifying factors a court should consider in exercising that discretion).

IT IS SO ORDERED.

_____
KIRTAN KHALSA
United States Magistrate Judge
Presiding by Consent